Good morning, counsel. I'm Judge Dennis. I'm sitting with Judge Higginson and Judge Willett. We'll be your panel today, and if you're ready, we'll call the first case. United States Department of Labor v. Five Star Automatic Fire Protection, LLC. We'll hear first from Mr. Milligan. Mike Milligan, El Paso, Texas, for the appellant. We are ready. We're ready for you. You may proceed. Ms. Johnson, Judge Dennis, and may it please the court. As far as I know, this is the first case in which a district court has found as a matter of law that an employer in the construction industry willfully disregarded its obligation to keep proper records of employees' hours of work. Based on that conclusion, the magistrate judge required the employer to pay the Department of Labor the full amount of back pay and liquidated damages, which it had demanded, close to a quarter of a million dollars. The department will in turn distribute the money to 53 present and former Five Star employees, each of whom will receive triple time for their hours, as computed by the department. By any measure, Louis and Veronica Palacios, the owners of Five Star, are unlikely candidates as test subjects. About a quarter century ago, in the East Courtroom, where you are now, I represented Mr. Palacios as one of two lead plaintiffs in a nationwide opt-in FLSA class action. His experiences in that case sensitized him to the problems of workers who basically have their time stolen, part of their lives. Their right to be someplace else while they're not working. Once he had his own business, many years later, after prospering in the fire protection sprinkler industry, he idealized himself as a humane and generous employer. During the period covered by this suit, he paid nearly half a million dollars in overtime to his workers, ignoring obvious ways he could have avoided such liability, such as fixed salary for fluctuating hours, which his employer had improperly used against him. I stand in my place and say to this honorable court that the magistrate judge misapplied the law, Anderson v. Mount Clements Pottery, and its progeny to the facts before it. Mr. Milligan, it's unclear to me if you're challenging only the liability finding, or I'm sorry, if you're challenging both the liability finding and the damages calculation, or only the latter, only the damages part? We are not contesting part of the liability finding. There was enough evidence to decide that the workers who testified had actually worked overtime. However, we are challenging the five stars liability as to the other employees, and in particular, the hours of their alleged return to work, which is the bulk of the cause of action. Does that answer your question? It is, and can you flesh out a little bit for me your challenge to the liquidated damages determination? We did not appeal the liquidated damages calculation. I looked and looked and looked for a case where someone, an employer, had been found guilty of violating the Fair Labor Standards Act and required to pay liquidated damages, and this court reversed it. The liquidated damages are more or less automatic in the Fair Labor Standards Act case, and we recognize that sad fact. We wish it were not the case. We wish that willfulness were subject to a willfulness standard, but that's not the law. The law is what it is, and I think the employees who testified will get triple time. In fact, liquidated damages and back pay both a time and a half for their time. You obviously have worked with them a long time. You know the area of the law, and you're being very candid with us, but can I just move back a little bit to Judge Weld's question? Because you're being frank, no liquidated damages appeal, but you are challenging liability as to the non-testifying employees, or you are just challenging the damages calculation? We are challenging liability as to all the non-testifying employees. And is that because you think Mount Clemens has been essentially overturned in Walmart Dukes, or because this judge misapplied Mount Clemens? It's part both. I think the judge misapplied Mount Clemens Pottery because he gave such short shrift to the evidence and the record that would have fleshed out the actual amount of time spent by these employees, particularly weeks when they could not possibly have worked overtime. We don't think Mount Clemens Pottery has been overruled completely by the Supreme Court, although two justices said they felt that it should be. I think what Tyson Foods did with Mount Clemens Pottery is it said that if the evidence submitted by the class representatives would satisfy the evidentiary needs of all the other plaintiffs in the case, if it would make the case for everybody, then representative testimony is admissible. And Justice Roberts had some problems even with that. But Mount Clemens Pottery is still the law, but I think in Walmart v. Dukes, the court made some inroads on the representative part of Mount Clemens Pottery. Quick question on, I'm sorry, Judge Higginson, go ahead. No, no, no, go ahead. Go ahead. I just had a kind of a documentation question. So this summary timesheet that Five Star made to explain the variations and work schedules and work locations and all that, what was that summary timesheet based on? I mean, are there any underlying documents that support that summary timesheet? Is it just based on the memory of someone as to different projects that employees worked on? What is the underlying kind of documentary basis for that timesheet? It was based on all of Five Star's records, which were voluminous, of the activities of the workforce. If you look at page 1000. Are those records themselves or the relevant excerpts of those records themselves in the record that we have? Yes, they are. The excerpts of the records, 516 pages, are at ROA 1121 through 1636. OK, so our record will include everything, every underlying document that would support what is contained in that summary timesheet. No, it does not. It does not contain every underlying, every underlying document. It includes most of them, but they, but Mr. Palacios, when he did his, when he did his compilation and his tabular summary, looked at the whole thing that you see on the table at page 1000 of the ROA and some of that information he used. It was available. It was in the possession of the Labor Department. And if there had been a hearing, probably if the court had really taken a deep dive into the calculation, it would have been introduced. But I think most of what we, of what went into the calculation is that those 500, is in those 516 pages. The calculation is based on those documents and not merely on Mr. Palacios' memory of different projects they might have worked on. That is correct. Well, when you say that's correct, I did read the trial. I mean, he testified and he's a sympathetic witness. And really, I remember him testifying very like what you said. He described his experience and then he and his wife therefore became perhaps, unfortunately for them, incredibly trusting. And as he testified, he simply trusted employees to notate their time. And he wanted them to put down every minute of their time, but it was a trust system. I thought that was his testimony. And in some ways, therefore, the fact that there weren't records came back to haunt him. But he was pretty adamant that it was a trust system, at least in my memory of his testimony. And it was. And that system is pretty much universal in the construction industry. You can't have time clocks when you're out in the field. Now, doesn't it trigger if but then it does trigger if there aren't records that the Department of Labor can use, it will trigger this Mount Clemens and are the case that Department of Labor, you know, relies on heavily is the Brennan case of ours. It allows as long as you know that there's represent this type of representational evidence. But there was but there was evidence that there was evidence in five stars records from which with painstaking effort, you could rebut the employees statements about the about the extent of an amount of their work. All we have to do to stay in the game in Mount Clemens pottery is to have evidence that undermines the employees, the employees estimates. And at that point, according to pattern jury charges, they have the ultimate burden of proving that their that their estimates are reasonable now. But I think that I think the the employer is still at even if he even if he has has records that are based on trust. And I don't think there's any any law that says that says that that's that's improper for the employer to do that. But she I mean, obviously, the magistrate listened to the investigator and the employees and looked at all the records fairly painstakingly, and she is very clear she credited the employees. And then in the post-trial brief, one critique, I believe, from your client was just it. Well, these employees must have lacked, quote, self-discipline. The argument was that they didn't record what they should have, and she ends up crediting them. Well, I think she I I think that doesn't that doesn't obviate the necessity for them to make reasonable estimates, though. I think they that they we did. We did. We have a lot of evidence, 516 pages in the record of giving details that that probably that that certainly Mr. Palacios included in his in his in his affidavit is the documents attached to his declaration that he did it. He did a heck of a job, if I may credit him with that, of of taking at least hundreds, possibly thousands of pages of records and getting them into into a table which is attached to his to his declaration. Judge Willard, I think I think you refer you were referring to that table, weren't you? Were you not? OK, I won't I won't use up any time trying to find exactly where it is in the record right now. Was the 53 employees who were awarded damages here in this case? Was Mr. Cobian the supervisor for all 53 of them? This was excuse me, I did not hear the question. I'm not sure the pronunciation. Cobian, Cobian, Jorge Cobian, was he the supervisor for all 53 employees who were awarded damages here? Do you know offhand? Yes, he was. Do you want to talk about the heavy reliance by the Department of Labor on our Brennan versus General Motors case? I remember that case, but I'm I'm sorry, I can't. What? That's fine. No, no, no, no. It's easy. It's they did they they rely on it. But you in their brief, you distinguished it. You were saying that they are the workers had more identical work than the sprinkler workers. Yes. Yes, there was that there was not anywhere near in Brennan the diversity of the workforce that that's here. That's your argument. Do we have your argument? Well, you have you have our argument in the brief. I've only got 51, 50 seconds left of my of my opening, and I want to save some time for for for rebuttal. I think it I think it is it is important to think about the diversity of the workforce and its effect upon the representative character of the of the testimony. And I think the if you look at if you look at what is if you compare the estimates of Ms. Alba and Mr. Palacios, you see that hers are flawed with over generalizations and faulty estimates, which grossly in fact, inflate the amount of the supposed damages. Mount Clements is not a means of targeting of lawyers in the construction industry, especially small family owned companies. Thank you. Thank you, sir. Miss Johnson. Miss Johnson. Thank you, Dennis. Good morning, your honors. And may it please the court. My name is Heather Maria Johnson representing the US. After having failed to comply with its statutory to accurately recording. We can't hear you. I'm sorry, you can't hear me at all. I hear you now. Yes. Okay. After having failed to comply with its statutory duty to accurately record and compensate for pre and post shift work performed by its construction employees and having benefited from this work. Five star now seeks to avoid paying its workers by arguing that the calculation of back wages is insufficiently precise. Five stars position is foreclosed by long standing clear precedent. As the Supreme Court explained in nineteen forty six in Anderson versus Mount Clements pottery. An employer who fails to keep accurate and complete records cannot then complain that the damages awarded lack the exactness and precision that would have been possible with those records. This court should affirm the district court's award of back wages for five stars workers for two reasons. First, the district court correctly applied Mount Clements by permitting workers consistent representative testimony to fill an evidentiary gap necessitated by five stars failure to keep accurate records and in calculating back wages. Second, the counter arguments raised by five star all based on purported variability in workers shifts and assignments are just not supported by the facts. Such variability to the extent it is supported in five stars records has already been taken into account in calculating the back wages. To my first point, can I interrupt you for a second before you get too far down that road? So the cases that the parties site, they seem to involve class actions or collective actions or both. And I wonder, are there any cases out there that support the application of Mount Clements to an action that is brought by the Department of Labor? Yes, your honor. We at the Department of Labor rely on Mount Clements in most of our enforcement actions. The alternative being to have every single employee testify. And I'm not sure if I have a case citation immediately available, but this is a common practice for the Department of Labor and has been accepted by many circuit courts. Okay. Is there any reason to think that the proof standards are any different outside of the class action or the collective action context? I believe you're referring to the standard for whether or not representative testimony would be permitted. And no, my understanding is that the threshold would be the same, whether it is an FLSA collective action brought by private parties or an action brought by the Secretary of Labor. Okay. In our circuit, we've said that representative testimony is permissible if those testifying employees have what we call personal knowledge of the work that is being performed by the non-testifying employees. Could you talk a bit about how that personal knowledge requirement was satisfied here? I sure can. So, while the construction employees here did ultimately go to different client job sites during the day, they were all required to be at Five Stars premises approximately 15 to 30 minutes before their official 7 a.m. shift. And at that time, they saw one another performing a similar work, which was gathering and loading materials that would be needed for that day's installation work. And specifically, I'm just looking to see if I can describe that testimony to you. So, foreman Seth Palacio testified that construction employees would try to arrive generally at 630 and that all of them would do so, and they would see one another perform the same work. Similarly, Acosta, one of the testifying construction employees, explained that most other construction employees also arrived around 630 and would spend that time gathering materials and loading construction, excuse me, loading the company trucks. So, for the periods of time that are at issue here, the pre and post shift work, the employees did have personal knowledge, excuse me, the testifying employees did have personal knowledge of the work performed by the non-testifying employees. I should also point out that here, unlike some of the cases, such as Walmart, that Five Star relies on, the 53 employees here had a single supervisor. They were subject to the same compensation policy under which they were required to arrive early and perform uncompensated work before their shift and not to leave the job site until 330 and to drive the company truck back to Five Star again without compensation. So, both the personal knowledge that is explicitly in the testimony, as well as the personal knowledge of the common policy that applied to all of the workers should be sufficient. And as you noted, we did rely quite a bit on the Brennan case, and I think that one truly is instructive in this case. In that case, there were three categories of employees who did work at different job sites and performed different but similar tasks, excuse me. And because there was a common policy, that was found to be sufficient for the purposes of allowing representative testimony. Thanks for that. So, going to our first point, the consistent representative testimony here in this case is relatively straightforward. There were six employees who testified for the Secretary of Labor. Those included both foremen and helpers, as well as both those that worked on overhead installation and underground installation projects. Despite that degree of variability, the workers all testified consistently about several key facts. Specifically, they testified that they were required to arrive often by 630, but certainly no later than 645, or they could face discipline or reprimand from their supervisor, Jorge Cobian. During this additional pre-shift time, they engaged in compensable activities, such as gathering materials and loading their company vehicles, which they would then drive to the job site. This loading activity was a necessary part of their job so that they would have what they needed for their shift at a client job site. Ms. Johnson, again, just having read the trial record, am I right that the owner was emphatic that it was a trust system? He'd gone through this himself, he wanted to be generous, and therefore he just simply trusted the employees and told them to record everything? Certainly, the trial testimony, that is consistent with how he testified. As I read it, the employees then said, and they really blamed the supervisor, this man, Mr. Cobian, and they said, no, no, no, no, Mr. Cobian is the one who told us to show up early and not record. Is that correct? That is generally correct, yes. Okay, and so then I thought that the judge specifically credited the employees over Cobian, and I thought, all right, well, that's not going to be able to be disturbed on appeal. But I kept looking for any government cross-examination of Cobian, and if I'm not mistaken, the government waived the opportunity to cross-examine him, and that made no sense to me. If the case turns on his claim, well, the employees claim that he's the one who said don't record it, and the owner says I told him to record it, why would the government not have cross-examined Cobian? Well, I will check to see if there was cross-examination. It'll take me just a second, but in the meantime, it is true that Mr. Palacios did testify that there were written instructions that employees were required to record all of their time. It is also noted in the record that those written instructions were provided to the employees, usually on their first day of work, along with other employment paperwork. The instructions were printed in English only. I guess the problem, I mean, you know this law well, but my problem is let's say the consensus testimony from the employer is that they told the employees to record their time. Does it allow for an FLSA case if then after they leave the firm, they say that they didn't record it? Can they actually still prevail, having been told to record it, and then they leave, and then they just say they didn't, and they're credited? It can work like that? Here, this really does turn on the competing testimony. Right, but there's no cross-examination. Okay, go ahead. So, Cobian disputed whether or not he told employees this. However, the district court did credit the employee's testimony. I know, and as I said, that would be conclusive for me on appeal, but the government didn't even try to cross-examine him, so it's just a bit, but I've made that point. I guess legally, the question I have for you, has any circuit questioned use of representational evidence under Mount Clements? I'm sorry, I didn't quite catch your question. Has any circuit questioned, even though there's been some scholarly critique, has any circuit, to your knowledge, tightened up the Mount Clements formula or its use at all, especially in light of Tyson or Walmart, to your knowledge? Not to my knowledge, although admittedly, I did not seek out examples of each circuit. Okay, and the last question on that is, is it an accurate limiting principle that in order to use representational proof, the employees that testify do have to have personal knowledge? Is that a correct statement of the law? That is a correct statement of the law. Okay, thank you. You're welcome. So going back to what I think you were getting at about competing testimony here, I do have another follow-up point to make there, which is, again, this is a competing testimony situation, but the employee and employers have different burdens here, because ultimately it is the employer who has a statutory duty to keep accurate time records and complete time records, and it's only when the employer does not meet that statutory requirement that we even get into a Mount Clements situation. And then once Mount Clements does apply because of that failure to keep records, then employees just have to put forth evidence showing liability and then evidence from which a just and reasonable inference can be made about the extent of the uncompensated work. No, I understand. I understand how it works. I understand all that. I guess it would have been so easy to cross-examine Cobian and say, I'm showing you timesheet number one for this employee, and why, how could it possibly be that all of them have exact hours if in fact they're all testifying they showed up early? And he would have had almost no way to answer. So it just startled me that he testifies on direct, that he told him to record everything he didn't, you know, say what they said. But anyway, it's just maybe I'm wrong, but I looked at the record pretty closely. What about opposing counsel's point that it couldn't have been representational testimony because some crews did night shifts, and some crews worked out of the country, and therefore there would be no way to extrapolate from the number of employees that were put on the stand. What I would say, Your Honor, is that the secretary conservatively estimated back wages and made every reasonable assumption in Five Star's favor. But the secretary did not make the across-the-board reductions that Five Star sought when those were not supported by the evidence. So a number of the reductions that Five Star sought had to do with factors that were already taken into account in the secretary's methodology, such as holidays, time off, four-day weeks. Those were already clearly accounted for. With respect to time, either shifts that were night shifts or out-of-town assignments, those shifts are just not reflected in the time records. Contrary to Five Star's assertions, the time records, for the most part, just include the total number of hours worked in a day, no starting and stopping times from which you might be able to glean whether it was a night shift or a day shift. They include a one- or two-word description of the location from which it was not possible for the secretary to determine whether those were out-of-town assignments. Now, there were a few timesheets, and I admit just a few, where there was pre- and post-work indicated. Were those subtracted from the ultimate damages calculation? I'm not quite sure what you mean, Your Honor. Well, you tell me if I'm wrong. Were there no exhibits of timesheets that reflected this short pre-workloading period or the drive-home period? There were none? It was uniform? My understanding, or I should say I'm not aware of any examples of a typical 7 to 3.30 shift where that was included. Now, Five Star notes that a specific early time may have been included in certain non-typical instances, and without looking at those particular timesheets, I'm not quite sure what might be going on there. But I will say that the secretary looked at all of the timesheets to determine whether or not the employees worked on that day. And so, for instance, maybe here's the way to answer your question. Most of the timesheets, they don't actually include what hours were worked, just the total that was worked. So it would not generally be possible for the secretary to look at those and determine whether they include any pre- or post-shift time. Did the magistrate accept uncritically the Department of Labor's damages total, or did she, or he, I don't remember who it was, actually accept some of the employer's disagreements? Were there faulty estimations, as Opposing Counsel said at the end of his argument? Most of the examples that were raised in Five Star's briefs were things that were not initially taken into consideration by the Department of Labor in its initial calculation. But after trial and after the secretary received the time records at issue, corrections were made. So at that point, the secretary did look at the particular days worked by each employee. In fact, the investigator went through on an employee-by-employee basis and a week-by-week basis to determine the hours worked. She gave credit to Five Star if an employee didn't work at a client job site that day. For instance, if an employee worked only at Five Star's fabrication shop or at Palacio's Ranch. The other issues raised by Five Star were not things that were readily discernible from the record, even after the trial testimony. And that is why the district court determined that these records, which perhaps Luis Palacio could look at them and from memory could, you know, based on a one or two word name, determine what location that was. It wasn't possible for the district court to do that or for the secretary. Thank you, Your Honors. I see that I'm out of time. If I may briefly conclude. I'm sorry. I said, I'm sorry, Your Honors. I noticed that I'm out of time. Would you like me to briefly conclude? I'm having trouble understanding what you are asking me. I'm sorry. I think go ahead and just do your conclusion. Thank you. Your Honors, the alternative Five Star advances in which any employer who fails to keep adequate records could avoid paying its workers because they do not estimate the amount they're owed with sufficient precision would reward employers who fail in their statutory duty by allowing them to keep the benefit of their workers uncompensated labor in contravention of the FLSA. This would incentivize poor record keeping and disadvantage employer, excuse me, disadvantage the employers who do actually comply with their FLSA record keeping obligations. Therefore, we ask this court to affirm the district court's award of back wages for Five Stars workers. Thank you. Thank you, Mr. Milligan. You have five minutes on rebuttal. We can't hear you, Mr. Milligan. Do you check your system to be sure? I think you're good now. Talk to us. Okay. First off, she is Johnson spoke about a statutory duty. There is no statute. There is a statutory duty to keep records, but it does not say that you cannot rely on the employees. Honesty. That's what happens in the construction industry. And that's what makes this a fairly important case. Because what you're what? What we're what we're talking about here is whether or not to to to give the the construction industry on a obligation to produce bricks without straw. Now, representative test representative testimony. The testifying employees did not testify that they had knowledge of what others were doing. They testified that they knew what was going on when they had a shift beginning at seven in the morning and ending at three thirty. They did testify about that and what other people were doing there. But Five Star had a great diversity of projects going on at various locations, starting at various times. They have to work around other contractors. They can't always be there. Be at a contract site at seven thirty. All that is set out in Mr. Palacios calculations. Oh, she must have. Pardon? Your sound went off. I think you're back now. Am I? I'm sorry. Thank you. The calculations were based on five days per week, but the payroll records had and the records are undisputed show many times the crews work four day weeks and there was no credit given for that. The calculation was based on loading each day. If you look at the pictures in the in the that we produced in the in the record excerpts, the the there's not enough room on the trucks to carry a lot of pipe that they as they claim they did. And there's and and in fact, the underground pipe that was so big, it had to be delivered by a flatbed, which is in which is in those pictures. So I think I I think they're they're the the tools they needed. It might be a wrench or something like that. But there was not a lot of a lot of time spent with the at the at the shop before they went out. The time they spent on the shop was not properly credited the time they spent the time they spent at the ranch was not was not was not itemized. She just took ballpark figures and put them in there as credit and the credit. The total credit came to, I think, something like two thousand dollars out of a total demanded of of one hundred and twenty five thousand dollars, not a significant reduction. If you look at Mr. Palacios calculation, especially in the record excerpts with the with with the summary attached, you can see you can see you can see the the errors in her work very, very clearly. Representative testimony, I when I represented Mr. Palacios before this court in about twenty four years ago, the we had a two week trial, 50 witnesses and we got it done. I don't see that representative testimony, I think, I think needs to be cabined to situations like like Tyson Foods, where everybody did the same thing all day long and stay up and had the same average doffing and donning. The lack of the lack of a cross examination of Mr. Kobe on was was interesting to us. We they I think it was it was certainly it certainly reflected a fear of what his of what his testimony would would be. I think that I think it's important to realize that five star had an open door policy. Luis Palacios was was a was an old school employer who came up through the ranks like the men got along well with them. There were many examples in the in the record of when of when people thought they'd worked overtime and they and he adjusted their their pay accordingly. I think it's we made a we touched briefly on an argument on the Mount under Farragher Ellers that this that if the employer has a has a way of adjusting problems like harassment in the workplace, then there ought to then then employees ought to ought to use that. And if they don't, that's very telling. Well, again, final question as you as your time expires, is that is that you under the parachute in that photograph on the wall behind you? Yes, it is. Just curious. I meant to take that from my reckless youth in the 82nd Airborne Division. Wow. I appreciate it. I was just curious about that. Well, thank you. Oh, that's all I have, Your Honor. I've I've been coming down here since 1974. And maybe this would be my last time if it is. Well, it's been a it's been a good run. Learned a lot. It doesn't look like this is your last time. You look pretty young and healthy. Well, I'm like, I'm like a 57 Chevy. I look good. I sound good. I work good. But the parts are wearing out. OK, thank you. And thank you. My only case may be excused. Yes, that's just a custom here in federal court here. If you don't ask to be excused until you say you say it's your only case. The case will be submitted.